ABLE COMPANY, A BUSINESS TRUST ORGANIZATION, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Able Co. v. Commissioner
Docket Nos. 37272-86, 37273-86, 37274-86, 37276-86, 37277-86
United States Tax Court
T.C. Memo 1990-500; 1990 Tax Ct. Memo LEXIS 553; 60 T.C.M. (CCH) 813; T.C.M. (RIA) 90500; September 20, 1990, Filed *553 Decisions will be entered under Rule 155. Jean S. Schanen, for the petitioners. Darren M. Larsen and Stephen P. Baker, for the respondent. HAMBLEN, Judge. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax [2] as follows: Able Company, a Business Trust Organization [3]
Docket No. 37272-86 Additions to Tax
Taxable Year
Deficiency
Sec. 6653(b) [4]
1977
$ 87,058
$ 43,529
1978
26,332
13,166
1979
5,535
2,768
Minn-Arctic Development Company, A Business Trust Organization
Docket No. 37273-86
Taxable year
Deficiency
Sec. 6653(b)
1977
$ 70,092
$ 35,046
1978
4,090
2,045
American Tax Education Society, A Business Trust Organization
Docket No. 37274-86
Taxable year
Deficiency
Sec. 6653(b)
1977
$ 40,168
$ 20,084
1978
91,580
45,790
1979
55,624
27,812
Glenn A. Huff
Docket No. 37276-86
Taxable year
Deficiency
Sec. 6653(b)
1976
$  43,289
$ 21,644
1977
173,244
86,622
1978
70,042
35,021
1979
24,712
12,356
Glenn A. Huff
Docket No. 37277-86
Taxable Year
Deficiency
Sec. 6653(b)
1980
$ 27,978
$ 13,990
*554 The issues to be decided *555 are (1) whether Glenn Huff (hereinafter petitioner) is liable for additions to tax under section 6653(b) because all or part of the underpayment of his 1976, 1977, 1978, and 1979 Federal income taxes is due to fraud (or, if not, whether the three-year limitation period of section 6501(a) is applicable); (2) whether so-called "business trust organizations," and the transactions entered into by them, were sham entities and transactions having no purpose or economic substance aside from being employed as part of a tax avoidance scheme; (3) whether petitioner's interest deductions on payments made in 1979 and 1980 to his wholly controlled entity were sham transactions entered into for the purpose of creating false deductions resulting in the underpayment of income tax liabilities knowingly owed by petitioner; (4) alternatively, whether petitioner is to be treated as an owner or part owner of the business trust organizations, with the income of the trusts properly being taxed to him; (5) alternatively, if the business trust organizations are corporations, whether they entered into sham transactions with each other in an attempt to improperly assign income; (6) alternatively, if the business *556 trust organizations are corporations, whether they are liable for additions to tax under section 6653(b) for 1977, 1978 and, 1979; [5] and (7) alternatively, if petitioner and/or the business trust organizations are not liable for additions to tax under section 6653(b) for the taxable years 1979 and 1980, whether they are liable for additions to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. The facts recited by this Court in , have been stipulated by the parties *557 to be a substantially accurate outline of the background and actions of petitioner with respect to the years 1976 and 1977. These facts are incorporated herein by this reference. Petitioner Glenn Huff resided in Wasilla, Alaska at the time the petitions in these cases were filed. Able Company, Minn-Arctic Development Company (MADCO) and the American Tax Education Society (ATES) are domestic "business trust organizations" which had at the time of filing the petitions a mailing address in Wasilla, Alaska. Petitioner graduated from Kansas State College in 1957. Petitioner is a civil engineer, licensed to practice in the States of Alaska, Kansas, and Wisconsin. He worked as an engineer for the State of Alaska Department of Highways for 12 years prior to the taxable years at issue. Petitioner has no legal training. Until the end of 1976, petitioner was a partner in the partnership Contracting Engineers. Petitioner became involved in real estate investment and development with Charles Bumpus, also of Wasilla, Alaska, in 1973. Mr. Bumpus enlisted in the Air Force in 1962 and spent thirteen and one-half years in the Air Force as a musician. Mr. Bumpus obtained a real estate license *558 in 1974. He had no prior experience in land development before his ventures with petitioner. Mr. Bumpus died prior to the trial of this case. Through their investment partnership and later through their business trust organization, MADCO, petitioner and Mr. Bumpus were mutually involved in various real estate partnerships. Petitioner and Mr. Bumpus controlled the assets of MADCO and made all investment and development decisions for MADCO. Petitioner withdrew as a partner from Contracting Engineers at the end of 1976 to devote his efforts full time to managing his investment activities. In mid-1976, petitioner and Mr. Bumpus developed concerns about the effect that the death of a partner would have upon the operation of their various partnerships and consulted an attorney in an attempt to resolve these concerns. However, before petitioner and Mr. Bumpus received what they considered to be satisfactory advice from their attorney, Mr. Bumpus was approached by Hiram Conley, an American Law Association (hereinafter A.L.A.) representative. Mr. Conley represented that there was a way for petitioner and Mr. Bumpus to eliminate their income and estate tax liability and to avoid probate *559 upon the death of a partner through the use of a certain kind of foreign business trust organization. Mr. Conley further represented that the subject had been thoroughly researched by Karl Dahlstrom, and that this information would be presented to members of A.L.A. at a two-day seminar for a fee of $ 6,600. The prospect of achieving the above-asserted advantages was particularly attractive to petitioner and Mr. Bumpus. Accordingly, through their partnership, MADCO, petitioner and Mr. Bumpus joined A.L.A., paid a single seminar fee of $ 6,600, and attended the seminar which was presented by Karl Dahlstrom in mid-November 1976 in Alaska. At the seminar, petitioner and Mr. Bumpus, as MADCO partners, received one package of materials (hereinafter referred to as the tax package). The tax package included preprinted forms for establishing "business trust organizations," preprinted minutes and trust certificates, and numerous excerpts from cases, legal commentary, newspaper articles, and other materials regarding trusts. Petitioner knew that Karl Dahlstrom was not a lawyer. Further, petitioner thought that the Dahlstrom program was complex and illogical. At trial, petitioner acknowledged *560 the tax avoidance scheme as "too good to be true." He thought Dahlstrom's conclusions differed from his understanding of how the Federal tax system operated. Petitioner did not seek or obtain authoritative legal advice on the legality of the program until 1979. Notwithstanding petitioner's doubts about the Dahlstrom program, he and Mr. Bumpus decided that they would disseminate the information they received at the seminar to all of their partners and partnerships so that they could alter their organizational format and henceforth conduct their affairs in the form of business trust organizations, rather than partnerships. Petitioner and Mr. Bumpus decided that the best method by which the tax package materials could be disseminated was through the utilization of their newfound knowledge relating to foreign business trust organizations. Accordingly, a few weeks after the November 1976 Dahlstrom seminar, petitioner and Mr. Bumpus traveled to the country of Belize (formerly British Honduras). They took with them the numerous forms for establishing trust organizations which they received as part of the tax package. While in Belize, they arranged for documents to be executed establishing *561 a number of foreign business trust organizations. These foreign entities were generally set up in groups of three. A person from the United States was named as trustee of one trust, called the number one company. The number one company was then named as trustee of the other two business trusts, the number two and number three companies. Dahlstrom's program instructed that if a foreign company had a U.S. trustee or a U.S. investor, it would be subject to tax on U.S. source income. The number two company had a foreign investor trustee but a U.S. investor. The number three company had a foreign trustee (the number one company) and no income directly from any U.S. source. According to the Dahlstrom program, the number three company was a nonresident alien that was allowed to make gifts to U.S. citizens that would not be subject to U.S. tax. Of the foreign entities created in 1976, petitioner was named trustee of Universal Trust, and Universal Trust was named trustee of Zurich Trust and International Tax and Business Consultants (ITBC). Mr. Bumpus was named trustee of Continental Trust, and Continental Trust was named trustee of Greenwich Trust and World Wide Marketing and Tax *562 Consultants (WWMTC). During 1977, petitioner and Mr. Bumpus created additional foreign business trust organizations, again traveling to Belize and executing documents identical to those used in 1976. Petitioner and Mr. Bumpus were named cotrustees of Mat-Su Trust Association and Royal Trust Association. Mat-Su Trust Association was named trustee of Wasilla Enterprises and Monitor Trust; Royal Trust Association was named trustee of London Trust and Capitol Enterprises. Some of the foreign trust entities were created without the necessary parties being present in Belize. At petitioner's office in Alaska, blank, undated trust documents were available for use which were presigned by Belizean citizens and officials. When he created his business trust organizations, petitioner utilized a seal, made in Alaska, which appeared to be an official Belize Government seal. An employee of MADCO, under the direction of petitioner and Mr. Bumpus, would execute and seal the documents in Alaska and then mail them to a post office box in Belize where, by prearrangement, a citizen of Belize would remail the package to give the appearance it was mailed from Belize instead of the United States. *563 Upon the formation of the business trust organizations in 1976, Mr. Bumpus transferred the tax package materials to WWMTC, while petitioner transferred the same materials to ITBC. Thus, the tax package materials formed part of the corpus of one entity controlled by Mr. Bumpus, and one entity controlled by petitioner. Dahlstrom's program was premised on a "circular transaction" whereby, simply stated, a taxpayer would pay a sum to a number two company, which he controlled as trustee of its trustee, for an ostensibly deductible business expense, such as consulting. The number two company would then pay the same amount to the number three company, also controlled by the taxpayer, as a dividend or certificate of distribution which would not be a taxable event. The number three company would then loan the sum to any third party, take back a promissory note, and then "gift" the note to the taxpayer, an action treated as a nontaxable gift of an intangible from a nonresident alien. The taxpayer then would call the note due and the third party borrower would pay off the loan to the taxpayer, completing the circle. In this manner, the taxpayer "created" a tax deduction in any amount *564 desired without ever losing control of the funds involved. Petitioner and Mr. Bumpus established bank accounts for these entities in Alaska, and petitioner and/or Mr. Bumpus had signature control over these accounts. Throughout the years at issue, many circular transactions took place. Each circular transaction created tax deductions while leaving the actual economic positions of the parties involved unchanged. Some of the circular transactions were completed under the guise of the sale of a tax package while others utilized terms like "consulting services" and "professional services." Petitioner admitted that, in reality, very few, if any, consulting or professional services were actually performed. Further, petitioner admits that the foreign business trust organizations and the circular transactions they engaged in had no business substance or other economic basis other than the generation of tax deductions. The following documents were created in connection with the above described circular transactions: checks for the loan and purchase; Promissory Note; Declaration of Contract; and receipt for purchase. Having established these organizations, petitioner and Mr. Bumpus *565 returned to Alaska and began to implement their plans to disseminate the tax package materials to their other partners and partnerships through their newly created foreign organizations. Additionally, the tax package materials were made available to certain individuals who were not partners in any of the various partnerships in which petitioner and Mr. Bumpus were partners. The transactions by which the tax packages were made available to the various partners, partnerships, and third parties were cast in the form of sales. The prices paid for the tax package by each purchaser varied as follows: Purchaser
Price
Woody Lake Estates partnership
$  6,725
Knollwood Heights partnership
17,800
Big Lake Heights partnership
23,000
Belair Estate partnership
6,750
Contracting Engineers & Associates
partnership 31,800
Skyline Estates partnership
8,750
Wasilla Estates partnership
15,900
Northern Lights Estate partnership
3,600
Wasilla Developments partnership
41,900
Eve Watson
8,750
George Simon
17,800
Charles E. Bumpus
11,000
Ralph Jokela
14,500
Norville Rich
10,675
Johnson Investments or Eugene Johnson
31,800
Johnson Investments or Eugene Johnson
26,500
Charles Bumpus Real Estate
10,675
Petitioner
3,825
Donald Saur
23,000
Ralph Huff
14,500
Christopher Bumpus
8,750
Eugene F. Morton
47,400
W. Kirk Marvin
26,500
*566 During the years at issue, petitioner was a partner in the following partnerships to the extent indicated: Partnership
Percentage Interest
Contracting Engineers
35 percent  (petitioner withdrew after 1976)
Wasilla Development
17.5 percent
MADCO
50 percent  MADCO was a partner in the following partnerships to the extent indicated: Partnership
Percentage Interest
Wasilla Estates
50 percent
Skyline Estates
50 percent
Knollwood Heights
50 percent
Big Lake Heights
40 percent
Belair Estates
50 percent
Woody Lake Estates
50 percent
Northern Lights Estates
67 percent
Petitioner had signatory authority over the bank accounts for these partnerships. The decisions that the partnerships would engage in these circular transactions in 1976 were made by petitioner, together with other partners. Petitioner, as an individual and a partner, purchased eleven identical "tax packages" in December 1976, for an amount in excess of $ 200,000. A similar copy of the tax package materials was made available to the purchasers at the offices of petitioner and Mr. Bumpus. However, the prices they paid for such materials, as indicated above, *567 varied from $ 3,600 to $ 47,400. At trial, petitioner offered no credible explanation as to how these varying prices were determined. Each sale of a tax package was preplanned and structured similarly. [6] A prospective purchaser would borrow the amount of the tax package purchase price from one of Mr. Bumpus' controlled entities and then buy a tax package from one of petitioner's controlled entities, or vice versa, using the proceeds of the loan to pay the purchase price. At the time the loans were made to prospective purchasers of tax packages, the parties intended that the borrowers would not ultimately be *568 required to repay the loan to the original lender. Petitioner and Mr. Bumpus devised two methods by which to implement this preconceived plan. One method was applied to notes signed by the individual purchasers, while the other method was applied to notes signed by the partnerships which purchased tax packages. With respect to the former, substantially all of the individual purchaser's promissory notes were given by the lending entity to entities controlled by the individual purchaser or a relative of that purchaser. Each note signed by a partnership, on the other hand, was repaid with partnership funds. However, each of these repayments was then immediately transferred in proportionate shares by the "lender" to entities controlled by each partner. Thus, these repayments, in fact, resulted in a distribution of partnership funds to each partner's controlled entity. In December 1976, petitioner and Mr. Bumpus transferred $ 49,175 from four partnerships in which they were partners -- Knollwood Heights, Woody Lake Estates, Skyline Estates, and Wasilla Estates -- into bank accounts established in Alaska for Greenwich Trust, Zurich Trust, ITBC, and WWMTC. From December 16, 1976, to *569 December 31, 1976, petitioner, along with Mr. Bumpus, circulated the $ 49,175 (plus $ 300 contributed by the foreign entities) through the bank accounts of the entities they controlled, creating $ 380,000 in deductions for themselves, associates, and partnerships on their 1976 tax returns. To create the deductions, Greenwich Trust "lent" money to nine individuals and partnerships. The individuals and partnerships then immediately used the "borrowed" money to "buy" tax packages from ITBC for a price varying from $ 3,600 to $ 47,400. Each entity "borrowing" money had a note payable to either Zurich Trust or to Greenwich Trust. ITBC then transferred the funds to Zurich Trust so that during the same period Zurich Trust "loaned" the same money to 13 individuals and partnerships, which was then immediately used to "purchase" tax packages from WWMTC from prices ranging from $ 3,825 to $ 31,800. WWMTC then transferred the funds to Greenwich Trust to complete the circular transaction. Although "paid for," a tax package was not received by each "purchaser." The following diagram tracks the circular transaction's steps back to where they started: [SEE ILLUSTRATION IN ORIGINAL] In late *570 December 1976, petitioner and Mr. Bumpus created another business trust organization called ATES (American Tax Education Society) and established themselves as cotrustees. Petitioner and Mr. Bumpus shared the decision-making authority jointly with respect to ATES and were the individuals in control of the profits of the entity. ATES was created as a vehicle through which petitioner and Mr. Bumpus could market the tax package materials to interested parties, as well as provide such purchasers with other assistance relating to business trust organizations. Petitioner and Mr. Bumpus then formulated a package which was later marketed through ATES. This package (hereinafter referred to as the ATES package) was made available for purchase at a cost of $ 11,000. Petitioner and Mr. Bumpus, as cotrustees of ATES, established an office and hired Wesley J. Milton, an accountant, to assist purchasers of ATES packages with any problems which might develop after their purchases. In early 1977, petitioner and Mr. Bumpus escorted their first group of ATES package purchasers to Houston, Texas, and on to Belize. This group consisted of 10 or 11 people. During 1977, petitioner created the domestic *571 business trust organization Able Company and named himself as trustee. Petitioner transferred his personal assets, including real properties, rights to income from installment sales, a savings account, and interests in Wasilla Developments Joint Venture and College Village Subdivision, to Able Company. As trustee, petitioner continued to have control over these assets and to make all investment and other decisions with respect thereto. Also during 1977, the domestic business trust organization MADCO was created. Petitioner and Mr. Bumpus contributed all the assets of their Minn-Arctic Development Partnership to MADCO and became MADCO's trustees. As trustees, petitioner and Mr. Bumpus each continued to control the assets of MADCO and make investment and development decisions for the business trust. MADCO continued the same business as its predecessor partnership. The effect of the provisions appearing in the "Contract and Declaration of Trust" for ATES, MADCO, and Able Company was that the trustees had complete control and dominion of the property of the trusts and were authorized, in their sole discretion, to distribute or transfer the property, its income or proceeds, to whomever *572 they desired, including themselves. The domestic business trusts created by petitioner were employed to accommodate the circular transactions in connection with the foreign business trusts. Compared with the 1976 Dahlstrom program transactions, the 1977 circular transactions were more complex. More entities and steps were used in each transaction. Deductions were claimed for consulting or similar services, rather than for purchases of tax packages. The deductions created by the circular transactions were frequently lumped in with other deductions, or characterized on the returns as items other than consulting or trustee fees. There was a significantly increased volume of transactions, some in unequal amounts and still others with the repayments made throughout the year. The transactions in 1978 became even more complex. The amounts of money used and the flow between entities were not as balanced as in prior years. While the transactions were much more complex, the overall flow of money between petitioner and the business trust organizations remained balanced for all practical purposes. Thus, deductions were generated while the actual dollar amounts did not ultimately change *573 hands. In December 1978, petitioner attended a meeting of attorneys and accountants in Anchorage, Alaska, at which an Anchorage tax attorney spoke about the invalidity of the Dahlstrom program and the prohibition against assignment of income. Huff chose to ignore the attorney's opinion and continued to use the program. The amounts paid into the foreign entities in 1979, such as ITBC, were part of the same type of circular transactions utilized in prior years. The funds were ultimately returned to petitioner or an entity under his control as the circular transactions were completed. On June 1, 1979, Baker Company was created by an employee of MADCO and ATES. Creation of trusts was routinely done, when requested, by the employee as a part of her job. Petitioner intended Baker Company to be the successor to Able Company. The only assets transferred into Baker Company were all of Able Company's assets, which included seventeen escrow accounts, a deed of trust, and several parcels of real property. Petitioner was appointed executive trustee of Baker Company. All trust certificates were held by Able Company, of which petitioner was executive trustee. Petitioner made all decisions *574 with respect to Baker Company and had total control over all its assets. The net results of the circular transactions among petitioner, MADCO, ATES, Able Company, and the foreign entities over the period 1976 through 1979 were that (a) significant tax deductions totaling over $ 700,000 were generated at no cost and claimed by petitioner, Able Company, MADCO, and ATES on their respective tax returns; (b) income was shifted by petitioner among the entities, Able Company, MADCO, and ATES; and (c) only $ 9,342 total tax was paid by all entities for the years at issue. During 1980, petitioner paid an amount of $ 14,494 to Baker Company which he claimed as a deduction for interest on his 1980 Form 1040. This interest deduction arose out of a transaction where Baker Company purportedly loaned money to petitioner for the financing of petitioner's personal residence in Minnesota. The amounts paid by petitioner to Baker Company attributable to interest totalled $ 6,062.37 in 1979 and $ 14,493.76 in 1980. At the time of the purported loan transaction, petitioner had full control over Baker Company which gave him full use and enjoyment of Baker Company's assets. Petitioner did not cooperate *575 with the Internal Revenue Service during its investigation. OPINION Background
For 1976, 1977, 1978, and 1979, petitioners have conceded the underlying deficiencies, and contest only the attribution of the various business trust organization's tax liability to petitioner, as well as the additions to tax for fraud. As to 1976, 1977, and 1978 tax years, the general three-year period of limitations for assessing tax under section 6501(a) expired prior to the issuance of notices of deficiency for those years. Therefore, although petitioners concede the deficiencies, no tax may be assessed for these years unless there was an underpayment of tax due to fraud. Petitioners concede a negligence addition for 1979, but contest any fraud addition. For the 1980 taxable year, respondent contends that payment of interest to Baker Company should not be allowed as a deduction because Baker Company is not entitled to recognition for tax purposes. Further, respondent contends that since Baker Company is entirely owned and controlled by petitioner, any interest payments made by petitioner to Baker Company are not properly deductible since petitioner is actually making interest payments *576 to himself. Petitioner contests the disallowance of interest payments made to Baker Company and further contests any assertion of a fraud or negligence addition to tax for 1980. Respondent argues that, based upon the totality of the transactions, the conceded improper deductions for all the years in issue are due to petitioner's fraud. Therefore, the three-year period of limitations is inapplicable and the deficiencies and additions to tax for fraud are proper. Respondent further argues that the business trust organizations created and controlled by petitioner are no more than sham organizations having no purpose other than avoiding Federal income taxes. As such, respondent determined that the organizations are not entitled to recognition for income tax purposes and "collapsing" all income of the entities to petitioner individually is appropriate. ISSUE 1.
Section 6653(b) Additions to Tax for Fraud
Respondent contends that the entirety of the evidence presented clearly and convincingly establishes that all or part of the underpayment of tax by petitioner Glenn Huff for the taxable years 1976 through 1979 is due to fraud, pursuant to section 6653(b). Petitioner *577 asserts that the taxable years 1976 through 1978 are barred by the three-year period of limitations on assessment and collection of the deficiencies under section 6501(a). However, subparagraph (c) of section 6501 provides that in the case of fraud, the three-year limitation does not apply and all years tainted by a fraud factor are open years. Consequently, we deem it necessary initially to determine if fraud was involved in those years. Section 6653(b) provides for an addition to tax if any part of a year's underpayment is due to fraud. The addition to tax is an amount equal to 50 percent of the amount of the underpayment. The burden of proving fraud by clear and convincing evidence is upon respondent. Sec. 7454(a); Rule 142(b); . When fraud is asserted for more than one taxable year, respondent must show that some part of an underpayment was due to fraud for each taxable year in issue in order for the corresponding addition for fraud for each such year to be upheld. ; . *578 Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. ; . A mistake of law, if indeed it is a mistake, is not equivalent to fraud with intent to evade tax. . However, the taxpayer must be of an honest, although mistaken, opinion that the transactions he engaged in were legally sufficient to support claimed deductions to conclude no fraudulent intent was present. . Whether fraud exists with respect to a particular tax year is a factual question which must be resolved by an examination of the entire record. Since fraud can seldom be established by direct proof, the requisite intent may be inferred from any conduct, the likely effect of which would be to conceal, mislead, or otherwise prevent the collection of taxes that petitioner knew or believed he owed. ; ; *579 . A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. ; . It must be decided in this case whether petitioner voluntarily and intentionally evaded a tax which he knew he was obligated to pay. The underpayment must have resulted from something more than petitioner's honest mistake as to the various transactions involved. Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. . In this case, petitioner concedes that the deductions claimed for consulting fees and the purchases of tax packages are not allowable. Petitioner thus concedes the underpayments exist. The only remaining issue is whether any portion of the underpayment in each year at issue was due to fraud. Many facts exist in this case that *580 clearly and convincingly establish that petitioner blatantly and intentionally endeavored to conceal, mislead, and otherwise prevent the collection of taxes knowingly owed by him. Petitioner's contention that he honestly believed that the use of the business trust organizations would result in proper deductions is incredible. Petitioner's whole course of conduct clearly and convincingly shows that the underpayments of tax were due to fraud. As set forth below, the evidence shows that petitioner claimed deductions on his 1976, 1977, 1978, and 1979 income tax returns which he knew were based on "payments" which were without substance and thereby attempted to evade taxes he knew to be owing. The foreign business trust organizations were created by petitioner for no other reason than tax avoidance. These entities are shams (as discussed below in issue 2 of this opinion) since, by petitioner's own admission, the entities had no profit objective or other business purpose except attempting to avoid the payment of properly owing Federal income tax. . *581 In an attempt to give credence to the sham entities, petitioner created fictitious transactions between the entities generating contracts, promissory notes, minutes, checks, deposit slips, invoices, and statements of account. However, petitioner knew that these transactions were counterfeit and lacked economic substance. He admitted as much when he conceded that the business trust organizations were created solely for tax avoidance and not for any other business reason. The making and use of false and fictitious documents is clearly a badge of fraud and evidence a willful attempt to defeat and evade the payment of Federal tax. . All of these fictitious transactions were exercises in obfuscation to generate deductions without economic outlay or depletion. Further, petitioner utilized a seal, made in Alaska, appearing to be an official Belize Government seal when he created his business trust organizations. The seals were executed in Alaska and then mailed to a post office box in Belize where, by prearrangement, a citizen of Belize would re-mail the package to give the appearance it was mailed from Belize instead *582 of the United States. This denigration of an ostensibly official sovereign seal is strong evidence of petitioner's intention to deceive and mislead in order to avoid properly owing Federal income tax. Petitioner admitted that the only purpose for the circular transactions was to generate tax deductions. No other valid business purpose existed for the transactions except to generate the deductions and return the original money to the original holder. In all the years at issue, petitioner attempted to conceal the circular deductions by reporting similar and identical transactions in various and inconsistent ways on his Federal income taxes. While some of the circular transactions were labeled as "other" transactions, identical transactions were mixed in with valid deductions and still others were shown as "fees for tax information" and "legal and professional fees." Petitioner stated that some, perhaps a minimal amount of, consulting services were performed relating to the various deductions taken for consulting and other similar services. However, there is not a scintilla of proof of even a de minimis amount of legitimate consultation here. All consultation and ostensible *583 transactions were an integral part of a scheme to obfuscate and cover up the nefarious objective to generate tax deductions at no valid or genuine cost. The use of these ostensibly deductible items in petitioner's tax avoidance scheme is yet another indication that petitioner was attempting to conceal his true purpose of tax evasion by disguising the scheme as a legitimate deduction. Just as the services rendered were fabrications, the amounts of the fees paid for them were arbitrarily determined by petitioner and his associates. The purchasers bought tax packages for amounts ranging from $ 3,600 to $ 47,400 for the same material. The amounts were not set according to the value (if any) of the tax packages but were rather set by the amount of deductions needed by the purchasing entity. At trial, petitioner gave no valid or credible explanation of the price discrepancies, although he did admit that the transactions were used to avoid taxes by creating deductions. Another fact establishing that the transactions between the business trust organizations were fraudulent is that most of the tax packages purchased during the years in question were never delivered to the purchaser. *584 Further, petitioner, who purchased eleven identical tax packages in December of 1976, already was in possession of all the documents included in the tax packages before the purchases were made. We do not believe that petitioner had an honest belief that purchasing 11 identical tax packages for over $ 200,000 within a two-week period of time would generate proper tax deductions, especially when all of the money ultimately was returned to him through his circular charade. We find petitioner unbelievable, considering petitioner was already in possession of the tax package materials at the time of the purchases and his circular money facade. Petitioner alleges that he did not know that the transactions were illegal until he was informed by his attorney of their illegality in 1979. Petitioner asserts that his discontinuance of the circular transactions at that time is evidence of his lack of fraudulent intent. To the contrary, the facts establish that petitioner continued with the circular transactions in 1979 even after he was informed of their illegality. Further, petitioner still claimed as deductions the amounts paid as fees to initiate the circular transactions on his 1979 Federal *585 income tax return. Thus, by petitioner's own admission, he signed and filed the 1979 income tax return knowing that at least some of the deductions claimed thereon were false. This is strong proof of petitioner's fraudulent intent. In 1977, and again in 1978, the circular transactions became more and more involved using many more steps to complete the circle. While the transactions were more complex, they still were without any purpose or substance other than tax avoidance. The fact that petitioner had to make each successive year's transactions more complex is indicative of his knowledge that his actions were not within the parameters of the tax law. This increased complexity is inconsistent with petitioner's claim that he thought the transactions were legal. Petitioner's argument at trial that he acted in such a manner in order to attract attention and "draw" an audit so that he could test the legality of his circular transactions is unbelievable and purely selfserving, especially considering that petitioner was uncooperative with the Internal Revenue Service during the audit process. The business trust organizations were created in a manner that allowed petitioner and his *586 associates always to maintain complete control of the trusts. The funds and property in the trust could be returned to petitioner and his associates at any time according to their whims. The entities were alter egos of petitioner used by him to assign his income away from him individually, thus creating a false front to mask his tax evasion scheme. When asked whether he thought the Dahlstrom tax evasion program was "too good to be true," petitioner replied categorically in the affirmative, "yes." In this one instance, petitioner was both truthful and correct. Yet, petitioner did not investigate further into the validity of the information presented at the Dahlstrom seminar. Instead, when petitioner heard an attorney speak about the illegality of the Dahlstrom program in December 1978, petitioner chose not to believe the attorney. Petitioner continued his illegal ways even after he admits he was informed of the illegality of the circular transactions. In short, petitioner decided to rely on only the information that allowed his deduction scheme to continue while disregarding the many instances where unfavorable information was obtained. This Court is not persuaded by petitioner's *587 weak argument that he did not have a fraudulent intent because he relied on someone else's interpretation of the tax law when petitioner was doubtful of the program's bona fides, had ample opportunity to find out the truth for himself, and subsequently was informed that the program was illegitimate. Based on the record as a whole, respondent has shown by clear and convincing evidence that petitioner could not have had an honest yet mistaken belief as to the legality of the circular transactions. Petitioner's sole purpose in structuring the circular money facades was to generate tax deductions at no cost in order to elude the payment of income taxes he knew he rightfully owed. This Court finds that by doing so he acted fraudulently. He is therefore liable for the determined and conceded deficiencies for the taxable years 1976, 1977, 1978, and 1979 and for the additions thereto for fraud pursuant to section 6653(b). [7]
*588 Having determined that each of the years 1976 through 1978 is tainted by fraud, those years are open and the three-year period of limitations provided by section 6501(a) is inapplicable. ISSUE 2.
Sham Entities and Transactions
Petitioner has conceded that the foreign business trusts had no economic purpose other than tax avoidance. We must determine whether the domestic business trust organizations and the transactions engaged in by them were shams, without economic substance, and therefore, nullities for Federal income tax purposes. . If they are shams, petitioner must include the entities' income on his personal return. The substance of a transaction, rather than its form, controls tax liability. ; , affd. . In matters concerning the application of Federal tax law to transactions, an entity may be disregarded where it is a sham or unreal. . The "sham" theory *589 requires an examination of not only the surface of the entities and transactions involved, but also their reality. , affd. per curiam . Questions of taxation must be determined by viewing what was actually done, rather than the declared purpose of the participants. When examining the income tax laws, substance controls over mere form. . This principle is particularly applicable to trusts because they are easily susceptible to manipulation. Moreover, in ascertaining such realities, a series of related transactions may not be broken into bits and pieces but must be viewed as a whole. , citing . Where a series of transactions, taken as a whole, shows either that the transactions themselves are shams, or that the transactions have no "substance, utility, or purpose" apart from tax considerations, the transactions are nullified *590 and not recognized for Federal income tax purposes. . When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. ; , affd. . The mere use of the word "trust" in a trust agreement cannot be relied on as a determination of whether a trust exists or not. The important consideration is not the formalities (however meticulously observed) in which the parties cast their transactions, but, rather the substance of such arrangements, including the motives promoting creation, the relation of the parties, and the other circumstances surrounding the transaction. . Further, if an entity is determined to be a sham, the entity is nothing more than a bald and mischievous fiction. Cf. . If the entity *591 is a trust, it is no less a fiction. . The fact that all of the entities involved herein are controlled, either directly or indirectly, by petitioner requires that the Court closely scrutinize transactions occurring among these entities and petitioner in determining their substance. , affd. . The evidence in this case overwhelmingly establishes that the domestic and foreign business trust organizations were sham organizations with the sole purpose of creating improper income tax deductions through the use of circular transactions. First, petitioner admits that the foreign trusts had no business function other than the generation of tax deductions. Accordingly, we find the foreign business trust organizations to be sham entities without economic purpose. Second, the domestic business trust organizations were nothing more than the mere nominees of petitioner and were established for the purpose of diverting income away from petitioner personally into a "trust" owned and controlled *592 by petitioner for the sole benefit of no one other than petitioner himself. Petitioner at all times directly or indirectly controlled all the business trust organizations in question by virtue of his position as trustee of the various entities. Under the operative provisions of the "trust documents," the trustee retains complete ownership of and control over all trust assets. Where petitioner "exercised the same dominion and control over the corpus of these trusts and the income arising therefrom as he had before the trust agreements were executed," it is clear the alleged trusts were shams. . Petitioner illegally used these entities by assigning income to them, thereby avoiding the payment of individual income tax and by generating knowingly improper tax deductions through them. Income is taxed to the person or entity that in fact earns the income. . Petitioner's assertion that the domestic business trusts should be recognized because they handled certain business transactions, continued in existence, and were funded with some capital is spurious considering *593 petitioner's admission that their only purpose was to expedite and accommodate the tax evasion scheme of circular money shams engaged in with the foreign business trusts. In sum, the domestic and foreign trusts must be viewed together and, when so viewed, that are unequivocally in pari delicto. Having previously considered the validity of entities created using trust language identical to the document terminology before us here, we follow our opinion in , and we hold that the foreign and domestic business trust organizations and the transactions engaged in by them are shams totally devoid of any economic substance other than as a coverup and obfuscating scheme to avoid the payment of properly owing Federal income taxes. As such, the business trust organizations are disregarded and all income formally attributed to them is properly attributed to petitioner personally. In computing petitiner's income tax liabilities for 1977 to 1980, inclusive, respondent collapsed back to petitioner all income and legitimate business expenses as if the trusts never existed. Therefore, no deficiencies will be due and owing by petitioners *594 Able Company, MADCO, or ATES in docket Nos. 37272-86, 37273-86, and 37274-86. ISSUE 3.
Interest Deductions
The next issue for consideration is whether the interest deductions claimed by petitioner in 1979 and 1980 relating to payments made on a home loan from Baker Company were sham transactions entered into for the purpose of creating false deductions resulting in the underpayment of income tax liabilities knowingly owed by petitioner. Nonbusiness interest, such as that paid on a personal home mortgage, is deductible as an itemized deduction under section 163. No interest, however, is deductible on a loan unless the loan and related transactions have economic substance apart from tax savings. , affd. . Baker Company was originally funded with the assets of Able Company which was funded with the assets of petitioner. Petitioner retained total control over Able Company and Baker Company. Any loan from an entity which is basically the alter ego of petitioner is a fiction. Petitioner again set up a tax evasion *595 artifice when he borrowed money from himself and claimed a deduction for doing so. Since the transaction relating to the interest payment lacks economic substance apart from tax savings, no deduction is proper. . As such, petitioner's interest deductions for 1979 and 1980 relating to the loan from Baker Company are disallowed. Having already found that the business trust organizations were sham entities established by petitioner to avoid the payment of taxes and having already found that petitioner knew the entities were shams, we now find that during 1980 petitioner continued to engage in transactions with entities he knew had no business purpose. He was told by attorneys in 1978, and again in 1979, of the illegality of this practice. In spite of these warnings, petitioner continued to deduct his interest on payments made to his wholly owned entity. Respondent has again established by clear and convincing evidence that these continued fictitious transactions were intended by petitioner to avoid paying Federal income taxes he knew were properly owing. Therefore, petitioner is subject to the additions to *596 tax as set forth by section 6653(b) for 1980. Alternative Issues
Having found petitioner acted with fraud in taking deductions in each of the years 1976 to 1980, inclusive, and having found that the business trust organizations are sham entities and that all income relating to them is properly attributed to petitioner, and having further found that petitioner is not entitled to interest deductions relating to the purchase of the Minnesota home, we need not address respondent's alternative issues. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith: Minn-Arctic Development Company, A Business Trust Organization, docket No. 37273-86; American Tax Education Society, A Business Trust Organization, docket No. 37274-86; and Glenn A. Huff, docket Nos. 37276-86 and 37277-86.↩
2. If the Court decides that section 6653(b) is not applicable with respect to the determined deficiencies for the taxable years 1979 and 1980, respondent requests the imposition of additions to tax under sec. 6653(a). See infra↩ note 5. 3. The use of the following words and derivatives thereof in our findings of fact and opinion is for narrative convenience only, following the form in which the various transactions involved herein were cast, and is not intended to indicate any legal conclusions concerning the actual substance or legal effect of the transactions or entities: "business trust organization," "trust," "entity," "business trust," "purchase," "sale," "loan," "note," "promissory note," "paid," "tax package," "contract," and "agreement." ↩
4. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
5. It should be noted that respondent has not asserted any deficiencies against Minn-Arctic Development Company for the taxable years 1979 and 1980. Therefore, our discussion of the asserted deficiencies and additions to tax for 1979 and 1980 do not include Minn-Arctic Development Company. See supra↩ note 2.
6. All of the purchasers involved herein, except Eugene Johnson and/or Johnson Investments, borrowed money from a Bumpus or petitioner-controlled entity to effect the purchase of their tax packages. With respect to Mr. Johnson and/or Johnson Investments, checks were exchanged on the same day with Mr. Bumpus and petitioner, and the money was immediately returned to an entity controlled by Mr. Johnson.↩
7. We are mindful of , in which this Court found that respondent did not prove fraud by clear and convincing evidence where the taxpayer, a dentist, utilized a Dahlstrom program. However, the taxpayers and the records in Pauli and this case are different. In Pauli, the Court found the taxpayer to be credible. In this case, we find petitioner Huff to be just the opposite -- incredible. Furthermore, in this case, petitioner Huff was an active and ardent organizer and promoter of the Dahlstrom transactions, and even developed augmentations of such programs. Further, Pauli↩ and this case each turns on its own peculiar factual context. See .